UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH DAKOTA
SOUTHERN DIVISION

| | |
|---|---|
| WILBUR-ELLIS COMPANY LLC,<br><br>Plaintiff,<br><br>v.<br><br>TAIT LACEY and J.R. SIMPLOT COMPANY<br><br>Defendants. | Case No. 4:23-cv-04097-LLP<br><br>**PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR A PRELIMINARY INJUNCTION OR, IN THE ALTERNATIVE, TEMPORARY RESTRAINING ORDER** |

Plaintiff Wilbur-Ellis Company LLC ("Wilbur-Ellis" or "Plaintiff") seeks entry of a preliminary injunction or, in the alternative, a temporary restraining order, to prevent Defendants Tait Lacey ("Lacey") and J.R. Simplot Company ("Simplot) (collectively, "Defendants") from continuing to violate and interfere with the plain terms of valid and enforceable post-employment confidentiality, non-competition, and non-solicitation restrictions contained in a certain employment agreement between Wilbur-Ellis and Lacey, as well as prevent Lacey from tortiously interfering with an agreement between Wilbur-Ellis and another former employee, Kevin Erikson ("Erikson").

The facts demonstrating Wilbur-Ellis's entitlement to an injunction in the instant case are clear. As a condition of Wilbur-Ellis's offer of employment in 2015, Lacey executed an Employment Agreement (the "Employment Agreement") with Wilbur-Ellis that, among other things, prohibited him from competing with Wilbur-Ellis within McCook County, South Dakota, and within a 100-mile radius of McCook County (the "Restricted Territory"), for a period of two years after his employment ended (the "Non-Compete

Provision"). The Employment Agreement also prohibited Lacey from soliciting, accepting business from, or interfering with, Wilbur-Ellis's customers within the Restricted Territory for the same period of time (the "Customer Non-Solicit Provision"). The Employment Agreement further prohibited Lacey from soliciting the employment of any person employed by Wilbur-Ellis, or its affiliates or subsidiaries, for the same period (the "Employee Non-Solicit Provision") (the Customer Non-Solicit Provision and the Employee Non-Solicit Provision, when referred to collectively, shall be referred to as the "Non-Solicit Provision"). The Non-Compete Provision and the Non-Solicit Provisions are wholly enforceable under South Dakota law.

Unfortunately, Lacey has not remotely lived up to his promises in the Employment Agreement. The evidence is undisputed that, following the conclusion of his employment with Wilbur-Ellis on January 13, 2023, Lacey almost immediately commenced employment with Simplot (a direct competitor of Wilbur-Ellis) in direct contravention of the Non-Compete Provision. Lacey also solicited multiple Wilbur-Ellis employees, including Erikson, to take employment with Simplot within the Restricted Territory, all in an open and brazen violation of the plain terms of the Employment Agreement. And as if to make sure that Wilbur-Ellis was on notice that he and Simplot had zero regard for their respective legal obligations to Wilbur-Ellis, Lacey completed the trifecta by soliciting Wilbur-Ellis customers in the Restricted Area alongside Erikson – in breach of his own promise not to do so and in intentional interference with Erikson's own restrictive covenants (of which Lacey was undisputedly aware). Lacey engaged in all of these legal violations with Simplot's knowledge and support. There can be little dispute that Lacey is

in breach of the Employment Agreement by virtue of his employment with Simplot and the solicitation of Wilbur-Ellis employees, including Erikson, and that Simplot is fully complicit by permitting Lacey to engage in such conduct with full knowledge that Lacey's actions violate his legal and contractual obligations to Wilbur-Ellis.

Likewise, Simplot, by hiring Lacey within the Restricted Territory immediately after his employment with Wilbur-Ellis came to an end, and by continuing to employ Lacey, despite the enforceable Employment Agreement, is openly interfering with Lacey's contractual promises to Wilbur-Ellis.

Defendants' unlawful competition and tortious interference has caused and will continue to cause Wilbur-Ellis significant, permanent, and irreparable harm. As set forth in detail below, unless Defendants' unlawful conduct is enjoined, Wilbur-Ellis will suffer immediate, continued and irreparable harm to its irreplaceable business goodwill and employee and customer relationships. Clearly, absent the Court entering the requested injunction, Defendants will not cease their unlawful acts that are causing Wilbur-Ellis irreparable harm. Accordingly, Wilbur-Ellis respectfully requests that the Court enter a temporary restraining order and preliminary injunction prohibiting Lacey from breaching the Employment Agreement and from interfering in similar restrictive covenants agreements between Wilbur-Ellis and any current or former Wilbur-Ellis employee, and prohibiting Simplot from interfering in Lacey's contractual obligations to Wilbur-Ellis by employing him within the Restricted Territory during the restricted period.

## FACTUAL BACKGROUND

I.  **WILBUR-ELLIS'S BUSINESS**

Wilbur-Ellis is an international marketer, distributor and provider of agricultural chemicals, fertilizer, seed, and related agronomic products, services, and technologies. (Declaration of Matthew Richmond, dated June 14, 2023, attached hereto as Exhibit 1 ("Richmond Decl.") ¶ 4.)  To serve its farm customers, Wilbur-Ellis sends experts to farms to sample and analyze soil, water, tissue, and other aspects of the farms' fields as part of an overall assessment of the needs of the farms, based in part on the crop and yield objectives of the individual farms.  (*Id.*, ¶ 5.)  Wilbur-Ellis also services farms by innovating and selling proprietary products, including seeds, fertilizers, herbicides, and other applications, both directly to farmers and through Wilbur-Ellis's network of dealers. (*Id.*)  By leveraging its vast portfolio of branded technologies and biological solutions, its relationships and arrangements with customers, suppliers, licensors, and other business partners, and its commitment to service, Wilbur-Ellis helps its customers achieve significant financial returns.  (*Id.*)  Wilbur-Ellis's business model involves strategically developing partnerships and relationships with farmers across the United States (including in South Dakota, the geographic region in which Lacey was employed by Wilbur-Ellis) to provide customized support and solutions with Wilbur-Ellis products based on the unique and individualized needs of the specific farm.  (*Id.*, ¶ 6.)

   A.  **Wilbur-Ellis's Invests a Substantial Amount of Time and Money in Developing and Training its Employees.**

Wilbur-Ellis offers significant training and continuing education programs to its employees to ensure the highest quality of service to clients.  (*Id.*, ¶ 20.)  By way of

example, Wilbur-Ellis offers more than 100 training modules on agronomy and advanced agronomy, which are available only to Wilbur-Ellis employees. (*Id.*)  Wilbur-Ellis also provides additional training programs available to Wilbur-Ellis's managers, including District Sales Managers and Territory Sales Managers−for example, select managers are nominated and selected to participate in a special management development program to assist the managers in their development as leaders in the sales organization. (*Id.*, ¶ 21.) Managers that are selected to participate in this program receive specialized training that includes meeting agricultural lobbyists in Washington D.C., meeting with representatives of various tech companies in California, and additional management training classes at Purdue University. (*Id.*)  The management development program is a two-year program and Wilbur-Ellis only accepts about twenty applicants per cycle. (*Id.*)  Wilbur-Ellis provides the opportunity for this training program, at significant investment of time and money by Wilbur-Ellis, to ensure the continued development of its management team, who contribute substantially to the success of Wilbur-Ellis's business endeavors. (*Id.*)

## II.     LACEY'S EMPLOYMENT WITH WILBUR-ELLIS

On or about April 1, 2015, Wilbur-Ellis acquired Lacey's Farmacy, an agricultural services company located in South Dakota owned by Lacey's parents, which was Lacey's employer prior to April 1, 2015. (*Id.*, ¶ 22.)  Lacey's Farmacy was a small, but competitive business with Wilbur-Ellis for business in the southeastern South Dakota region. (*See id.*) During his employment with Lacey's Farmacy, Lacey was a key member of the company and was responsible for, among other things, developing Lacey's Farmacy' business strategies, customer relationships, confidential customer information and customer

goodwill. (*Id.*, at ¶ 23.)  Lacey had access to virtually all of Lacey's Farmacy' valuable trade secrets, customer relationships, and customer goodwill developed by Lacey's Farmacy. (*Id.*) As part of the acquisition, a number of employees of Lacey's Farmacy, including Lacey, were offered employment with Wilbur-Ellis. (*Id.*, at ¶ 22.) Lacey accepted the offer of employment with Wilbur-Ellis and was initially hired as the Branch Manager for Wilbur-Ellis's Salem, South Dakota, branch location. (*Id.*)

It was therefore critical for Wilbur-Ellis to protect the trade secrets, confidential information, and customer goodwill that it acquired from Lacey's Farmacy after the acquisition, including from Lacey's improper use or disclosure of any Lacey's Farmacy trade secrets and other confidential information (which was now owned by Wilbur-Ellis) and from Lacey's improper conversion of customer relationships and other damage to customer goodwill that would occur if Lacey took employment with a competitor of Wilbur-Ellis. (*Id.*, at ¶ 24.) Because of the work Lacey performed for Wilbur-Ellis, his access to Wilbur-Ellis's customer relationships and goodwill, and the sensitivity of the information to which Wilbur-Ellis granted Lacey access as a result of his employment, Wilbur-Ellis required Lacey to agree to certain restrictive covenants at the inception of employment. (*Id.*) As an express condition to his employment with Wilbur-Ellis, Lacey executed an Employment Agreement, with an effective date of April 1, 2015. (*Id.*, and Exhibit A thereto.)

As consideration for his execution of the Employment Agreement, Wilbur-Ellis agreed to: (1) employ him full-time as Branch Manager for Wilbur-Ellis's Salem, South Dakota facility; (2) pay him an initial salary of $150,000.00, which was subject to annual

review and increased during his employment; (3) enroll him in the company's bonus program; (4) pay him a transition incentive bonus totaling up to $750,000.00 upon meeting certain conditions; (5) provide him with a company vehicle at no cost; (6) enroll him in the company's fringe benefits program; and (7) allow him access to Wilbur-Ellis's highly confidential, proprietary, and technical information, as well as Wilbur-Ellis's customer relationships, so that he could successfully perform his job duties and support the Salem branch.  (*Id.*, ¶ 25.)  Wilbur-Ellis would not have provided Lacey with any of the extremely lucrative compensation and benefits of employment except for his execution of the Employment Agreement and promises to abide by its terms.  (*Id.*)  Stated differently, Lacey was handsomely compensated by Wilbur-Ellis in exchange for his promises in the Employment Agreement.  (*See id.*)

Lacey commenced his employment with Wilbur-Ellis as a Branch Manager of the Salem location on or about April 1, 2015.  (*Id.*, ¶ 31.)  Throughout the duration of his employment, Wilbur-Ellis invested substantial efforts into Lacey's growth and knowledge in the industry.  (*Id.*)  From April 1, 2015, through July 3, 2022, Lacey held a series of sales focused positions including Branch Manager, Territory Sales Manager, and District Sales Manager.  (*Id.*, ¶ 32.)  These positions all utilized protected customer information compiled by Sales Agronomists to strategize and develop customer sales.  (*Id.*)  During this time, Lacey continued to develop relationships with customers in South Dakota.  (*Id.*)  Additionally, Lacey was selected to participate in the special management development program, which lasted two years.  (*See id.*, ¶ 33.)

7

On July 3, 2022, Lacey transitioned to a role as the Director of Business Development, a role in which he was responsible for developing and implementing sustained business growth through investments in new technologies, new business concepts and support regenerative/carbon strategies. (*Id.*, ¶ 34.)  The Director leads the Business Development team in collaborating across the division in support of the division's strategic plan. (*Id.*)  In this role, Lacey had access to a significant amount of proprietary information related to Wilbur-Ellis and its business partners, as well as broad access to critical business and customer information. (*Id.*)  Upon information and belief, Lacey also worked to maintain relationships with Wilbur-Ellis clients during this time. (*Id.*)

Lacey was well compensated by Wilbur-Ellis due to his valuable abilities in customer retention, and employee development and retention. (*See id.*, ¶ 35.)  For example, in 2022, his last full year of employment, Lacey was compensated $294,447.18.  (*Id.*) Lacey would never have had the opportunity to receive such substantial compensation from Wilbur-Ellis but for his signing the Employment Agreement that was a condition of his original offer of employment with Wilbur-Ellis. (*Id.*)

### A.  Lacey's Restrictive Covenants with Wilbur-Ellis.

As noted above, because of the work Lacey performed for Wilbur-Ellis, Wilbur-Ellis required that he agree to certain confidentiality, non-solicitation, and non-competition provisions in his Employment Agreement as a condition of his employment. (*See id.*, ¶ 24, Ex. A.)  Among other things, Lacey promised not to engage in any "Competitive Business" (as defined in the Employment Agreement), solicit or accept business from Wilbur-Ellis's customers and prospective customers within the Restricted Territory, or solicit Wilbur-

8

Ellis's employees. (*Id.*, at ¶ 26.) Specifically, Section 5 of the Employment Agreement restricts Lacey's ability to compete and solicit in a Competitive Business after his employment:

> <u>Covenant Not to Compete; Non-Solicitation</u>. Employee covenants and agrees that he will not, (i) anywhere, at any time during his employment, and (ii) within McCook County, South Dakota, and within a 100 mile radius of such county, for a period of two (2) years following the termination of his employment (whether terminated by Employer or Employee), directly or indirectly: (a) engage in any business engaged in the marketing, distribution, sale or application (or any segment thereof) of agricultural chemicals, fertilizers, seeds and related products (the "Competitive Business"), whether such engagement shall be as an owner, partner, employee, agent, consultant, or shareholder (except as the holder of not more than five percent (5%) of the outstanding shares of a corporation whose stock is listed on any national or regional securities exchange or any successor thereto) or in any other capacity; (b) solicit, divert or accept business from or otherwise take away or interfere with any customer of Employer or its affiliates or subsidiaries engaged in any Competitive Business, including without limitation, any person who was a customer of, or whose business was being pursued by, Employer in the conduct of its business prior to the date hereof; or (c) solicit the employment of any person employed by Employer or its affiliates or subsidiaries.

(*Id.*)

Furthermore, Lacey expressly agreed, by executing the Employment Agreement, that the scope of the limitations and restrictions were reasonable and necessary to protect Wilbur-Ellis's goodwill and proprietary interests, and that his breach of the Non-Compete Provision, the Non-Solicit Provisions, and/or the confidentiality provision (collectively, the "Restrictive Covenants") would cause irreparable harm to Wilbur-Ellis, and that Wilbur-Ellis would be entitled to an immediate injunction to restrain Lacey from violating the Restrictive Covenants, in addition to other remedies. (*Id.*, ¶¶ 27-28.) Lacey and Wilbur-Ellis further expressly agreed that the rights of Wilbur-Ellis and the obligations of

9

Lacey pursuant to the Restrictive Covenants would survive the termination of the Agreement. (*Id.*, ¶ 29.) Finally, the parties agreed that the Agreement shall be construed and enforced in accordance with the laws of the State of South Dakota. (*Id.*, ¶ 30.)

### III. LACEY BREACHES HIS AGREEMENT

Lacey now works for Simplot and works primarily from his home in Sioux Falls, South Dakota, which is within the Restricted Territory. (*See id.*, ¶ 36.) It is beyond dispute that Lacey's new employer, Simplot, is a direct competitor of Wilbur-Ellis and that his employment with Simplot is in violation of the plain terms of the Agreement. (*See id.*) Simplot is a food and agribusiness company that provides plant nutrition and food processing services, services farmers, and sells seeds and other services for crop growth and production. (*Id.*) This breach and interference is ongoing and, unless enjoined, Wilbur-Ellis will continue to suffer irreparable damages as a result.

### IV. LACEY UNLAWFULLY SOLICTS WILBUR-ELLIS EMPLOYEES AND CUSTOMERS

Furthermore, subsequent to his hire at Simplot, Lacey contacted multiple Wilbur-Ellis employees for the purpose of soliciting their employment on behalf of Simplot, including Erikson and former Wilbur-Ellis Facility Manager Phil Heiberger. (*See id.*, ¶¶ 37, 39-40, 43.) By inducing Erikson's resignation from Wilbur-Ellis in favor of Simplot, where he also works within the Restrictive Territory, Lacey tortiously interfered with the promises owed by Erikson to Wilbur-Ellis, by virtue of his own employment agreement containing identical restrictive covenants to those in Lacey's Employment Agreement. (*See id.*, ¶ 41.) Erikson remains employed by Simplot as of the date of this pleading and,

like Lacey, continues to irreparably harm Wilbur-Ellis's corporate goodwill and customer relationships by virtue of his own unlawful competition.  (*See id.*, ¶ 42.)

Furthermore, Lacey has solicited numerous Wilbur-Ellis customers within the Restricted Territory on behalf of Simplot, and has already succeeded in converting at least 10 such customers, resulting in almost $1.1 million in lost revenue to Wilbur-Ellis to date. (*See id.*, ¶¶ 38, 44.)  Lacey's solicitation of Wilbur-Ellis customers (both independently and in coordination with other former Wilbur-Ellis employees) has been successful because of his sway over the customers' purchasing decisions, which comes as a direct result of the relationships and goodwill that Lacey developed and maintained on Wilbur-Ellis's behalf during his employment.  (*Id.*, ¶ 38.)  In other words, Lacey is stealing Wilbur-Ellis's customer relationships and goodwill, all in direct violation of his legally enforceable promises not to do so in the Employment Agreement.  (*Id.*)

Defendants' actions send a clear message that they have no intention of honoring Lacey's—or other Wilbur-Ellis employees'—legal and contractual obligations to Wilbur-Ellis, which necessitates emergency injunctive relief.  (*Id.*, ¶ 45.)

## LEGAL ARGUMENT

### I. LEGAL STANDARD.

The Eighth Circuit Court of Appeals has held that district courts in this Circuit must consider the following factors in deciding whether to grant preliminary injunctive relief: (1) the probability that the moving party will succeed on the merits of its claims; (2) the threat of irreparable harm to the moving party should a preliminary injunction be denied; (3) the balance between this harm and the harm that granting the injunction will cause to

the other parties to the litigation; and (4) the public interest in granting the injunction. *Dataphase Sys., Inc. v. CL Sys., Inc.*, 640 F.2d 109, 113 (8th Cir. 1981) (*en banc*); *Jones v. Jegley*, 947 F.3d 1100, 1104 (8th Cir. 2020). In considering these factors, no single factor is determinative, and courts should use a flexible approach. *United Indus. Corp. v. Clorox Co.*, 140 F.3d 1175, 1179 (8th Cir. 1998). For example, "where the movant has raised a substantial question and the equities are otherwise strongly in [his] favor, the showing of success on the merits can be less." *Dataphase*, 640 F.2d at 113. Thus, the Court must employ a sliding scale in ascertaining whether injunctive relief is appropriate in which the strength of some factors outweigh any weakness in others. *Id.* Because all of the *Dataphase* factors weigh in favor of injunctive relief in this matter, Wilbur-Ellis is entitled to a preliminary injunction against Lacey and Simplot in the instant case.

## II.   WILBUR-ELLIS HAS A STRONG PROBABILITY OF SUCCEEDING ON THE MERITS OF ITS CLAIMS.

Injunctive relief is appropriate here first because Wilbur-Ellis is likely to succeed on its claims against Defendants. The Eighth Circuit does not require a strong showing to satisfy this element:

> [I]t is error for a district judge to attempt to predetermine the merits of a case on only a preliminary showing. For this reason the requirement of probability of success should not turn on a mathematical likelihood of success.

*N.I.S. Corp. v. Swindle*, 724 F.2d 707, 710 n.3 (8th Cir. 1984). The Eighth Circuit has further clarified that, "the question is not whether the movant has proved a greater than fifty percent likelihood that it will prevail," *PCTV Gold, Inc. v. SpeedNet, LLC*, 508 F.3d 1137, 1143 (8th Cir. 2007), but rather whether any of its claims provide a fair ground for

12

litigation." *Watkins, Inc. v. Lewis*, 346 F.3d 841, 844 (8th Cir. 2003). "In considering the likelihood of the movant prevailing on the merits, a court does not decide wither the movant will ultimately win." *PCTV Gold*, 508 F.3d at 1143. As set forth below, this *Dataphase* factor weighs in favor of issuing a preliminary injunction.

### A. Wilbur-Ellis Is Likely to Succeed on the Merits of Its Breach of Contract Claim against Lacey.

Lacey has undeniably breached the plain terms of the Employment Agreement by commencing employment with Simplot and soliciting at least one Wilbur-Ellis employee for Defendants' benefit, all within the Restricted Territory. Because the evidence of breach cannot reasonably be in dispute (as set forth in detail above), the only question is whether the Employment Agreement is somehow unenforceable under South Dakota law. As set forth below, however, the Restrictive Covenants are fully enforceable and, as a result, Wilbur-Ellis is almost certain to prevail on the merits of its contract claim against Lacey.

### 1. The Restrictive Covenants in the Employment Agreement Are Valid and Enforceable Under South Dakota Law.

The Employment Agreement and the Restrictive Covenants, to which Lacey agreed in exchange for a lucrative compensation package are fully enforceable. Specifically, the Employment Agreement at issue is nearly identical to the employment agreement between Erikson and Wilbur-Ellis, and contains identical Restrictive Covenants and an identical survival clause, and this Court has already determined that the restrictive covenants contained in Erikson's employment agreement survive and remain in full force with respect to him. *See Wilbur-Ellis Company, LLC v. Erikson and J.R. Simplot Company*, No. 4:23-cv-04058-LLP, 2023 WL 3980330, at *5 (D.S.D. June 13, 2023).

13

### 2. There Is No Dispute That Lacey Is in Breach of the Restrictive Covenants in the Employment Agreement.

Lacey's employment with Simplot is in clear and direct breach of his promise not to compete and within the Restricted Territory. Wilbur-Ellis is likely to prevail on the merits of its claim that he has breached the Employment Agreement. Lacey, shortly after departing Wilbur-Ellis, joined a direct competitor to compete against Wilbur-Ellis in the agricultural services industry for the same pool of customers. Further, Lacey is doing so just down the road from where he worked with Wilbur-Ellis, where he is indisputably soliciting Wilbur-Ellis's customers within the Restricted Territory. There can be little doubt that Lacey's actions directly contravene his legal obligations pursuant to the Customer Non-Solicit Provision. It is similarly without doubt that Lacey's solicitation of Wilbur-Ellis employees (in the case of Erikson, in violation of Erikson's own post-employment obligations to Wilbur-Ellis) violates the Employee Non-Solicit Provision. Wilbur-Ellis is likely to succeed on the merits of its breach of contract claim against Lacey and, therefore, this factor weighs heavily in favor of injunctive relief.

### B. Wilbur-Ellis is Likely to Succeed on the Merits of Its Tortious Interference Claim against Defendants.

The essential elements of a tortious interference with contract claim in South Dakota consist of: (1) the existence of a valid contractual relationship; (2) intentional interference with that relationship; (3) by a third-party; (4) accomplished through improper means or for an improper purpose; (5) a causal effect between the interference and damage to the relationship; and (6) damages. *See Gruhlke v. Sioux Empire Fed. Credit Union, Inc.*, 756 N.W.2d 399, 406 (S.D. 2008). Wilbur-Ellis can prove each of these elements with respect

14

to its claim that Lacey tortiously interfered with Erikson's employment agreement, and with respect to its claim that Simplot tortiously interfered with Lacey's Employment Agreement. Accordingly, is likely to succeed on the merits of both claims.

As noted above, Wilbur-Ellis has already demonstrated the existence and enforceability of Erikson's employment agreement, as well as Erikson's breach thereof. *See Erikson*, No. 4:23-cv-04058-LLP, 2023 WL, at *5. It is further undisputed that Lacey, with full knowledge of Erikson's obligations to Wilbur-Ellis, solicited Erikson to breach his own restrictive covenants by joining Simplot in Beresford, South Dakota. Lacey has not provided (and will not be able to provide) any proper motive for the unlawful interference – because no such proper motive exists. Finally, the evidence of damages and causation is striking. Due to this unlawful interference by Lacey, Erikson resigned Wilbur-Ellis to join Simplot and has assisted Lacey in successfully soliciting at least 10 Wilbur-Ellis customers to move their business to Simplot.

Likewise, pursuant to this Court's decision in *Erikson*, Defendants cannot dispute the existence or enforceability of Lacey's Employment Agreement. It is also unlikely that Simplot, due to its ongoing litigation with Wilbur-Ellis over Erikson, was unaware that Lacey was similarly subject to Restrictive Covenants in the Employment Agreement. Nonetheless, by hiring and continuing to employ Lacey within the Restricted Territory, and by permitting Lacey to solicit Wilbur-Ellis employees and customers, Simplot is procuring, supporting, and benefiting from Lacey's breaches. Simplot has not identified, nor can it identify, a proper motive for this unlawful interference, because no such proper motive exists. Instead, Simplot's motive is abundantly clear−namely, to steal as much

business as possible from Wilbur-Ellis. Finally, as with Wilbur-Ellis's tortious interference claim against Lacey, Wilbur-Ellis has suffered significant damages to date (more than $1 million in lost revenue) due to Simplot's tortious interference with Lacey's Employment Agreement.

Wilbur-Ellis is therefore likely to prevail on its tortious interference claims, weighing in favor of injunctive relief.

### III. WILBUR-ELLIS WILL SUFFER IRREPARABLE HARM IF THE COURT DOES NOT ENJOIN DEFENDANTS FROM COMPETING WITH WILBUR-ELLIS AND SOLICITING ITS EMPLOYEES AND CUSTOMERS.

It is undeniable that Wilbur-Ellis will suffer significant and irreparable harm without an immediate injunction that prohibits Lacey from competing with Wilbur-Ellis, and soliciting Wilbur-Ellis's customers within the Restricted Territory and soliciting Wilbur-Ellis's employees, and that further prohibits Defendants' continued interference with Wilbur-Ellis's contractual relations with Erikson and Lacey. Courts routinely hold that irreparable harm results and can be inferred where, as here, a former employee breaches their employment agreement's restrictive covenants. *See Medtronic, Inc. v. Gibbons,* 527 F. Supp. 1085, 1091 (D. Minn. 1981), *aff'd*, 684 F.2d 565 (8th Cir. 1982); *Marco, Inc. v. Advanced Systems, Inc.*, No. CIV 11-4072-KES, 2011 WL 2748691, at *10 (D.S.D. July 13, 2011); *see Novus Franchising, Inc. v. Dawson*, 725 F.3d 885, 894 (8th Cir. 2013) ("In a proper case irreparable harm to the employer may be inferred if it can be shown that the employee breached an enforceable restrictive covenant."); *Erikson*, 4:23-cv-04058-LLP, 2023 WL, at *5 ("The mere violation of non-compete and non-solicitation covenants

16

suffices to show irreparable harm."); *see also Sterling Computers, Corp. v. Fling*, No. 4:19-CV-04137-KES, 2019 WL 5104013, at *6 (D.S.D. Oct. 11, 2019) (ordering preliminary injunction and finding irreparable harm where employer asserted that because of former employee's use of confidential information and violation of the noncompete agreement, former employee and new employer would be able to unfairly compete and undercut former employer); *see also N.I.S. Corp. v. Swindle*, 724 F.2d 707, 710 (8th Cir. 1984) ("If the noncompete agreements are valid, then we think an irreparable injury has been shown.").[1]

Here, not only has Lacey breached his Restrictive Covenants, but he also tortiously caused Erikson to breach his own restrictive covenants to Wilbur-Ellis. Furthermore, Simplot continues to tortiously interfere with Lacey's contractual obligations to Wilbur-Ellis pursuant to the Employment Agreement. Both Erikson and Lacey remain employed by Simplot, in violation of these restrictive covenants, continuing to steal customers and business from Wilbur-Ellis, which will create irreparable harm that demands injunctive relief.

## IV.  THE BALANCE OF HARMS WEIGHS IN FAVOR OF A PRELIMINARY INJUNCTION.

The balance of harms weighs heavily in favor of Wilbur-Ellis and favors issuance of a preliminary injunction in this case. Because an injunction will only prohibit

---

[1] Even in the event the Court were to somehow find that Wilbur-Ellis has not presented sufficient evidence of irreparable harm (and Wilbur-Ellis submits that there is ample evidence), Wilbur-Ellis can meet its burden of proving irreparable harm simply by virtue of Lacey's specific agreement that his breach has caused irreparable harm. (*See* Richmond Decl., at ¶ 28, Ex. A.)

Defendants from engaging in illegal conduct in which they have no legal right to engage (breaching and interfering with Lacey's obligations to Wilbur-Ellis, and Lacey's interference with Erikson's obligations to Wilbur-Ellis), issuance of an injunction will not result in any significant harm to Defendants. *See Erikson*, 4:23-cv-04058-LLP, 2023 WL, at *6. Furthermore, the Restrictive Covenants merely restrain Lacey's conduct within the Restricted Territory – stated differently, there is nothing preventing Lacey from working for Simplot outside of the Restricted Territory (assuming he does so lawfully). Courts have routinely found the balance of harms weighs in favor of plaintiffs is such situations. *See e.g. N.I.S.*, 724 F.2d at 710 (holding that the balance of equities weighs in favor the plaintiff where restrictive covenants are at issue); *Uncle B's Bakery, Inc. v. O'Rourke*, 920 F. Supp. 1405, 1437 (N.D. Iowa 1996) (finding the balance tipped in favor of injunction where plaintiff would suffer significant injury, economic and non-economic, if disclosure of its confidential information and trade secrets were not enjoined); *Reg Seneca, LLC v. Harden*, 938 F. Supp. 2d 852, 861 (S.D. Iowa 2013) (holding that the balance of harms favors an employer where the employer took great care to protect its confidential information and significant investments with restrictive covenants).

      Here, Wilbur-Ellis only requests that the Court enjoin Defendants from breaching or interfering with his Employment Agreement, including prohibiting his unfair competition (via his employment with a direct competitor within the Restricted Territory) and his solicitation of Wilbur-Ellis's employees, and Wilbur-Ellis's customers within the Restricted Territory, and from interfering with Erikson's employment agreement with Wilbur-Ellis. As noted above, Lacey is able to compete against Wilbur-Ellis, even on

18

behalf of Simplot, if he does so outside of the Restricted Territory. On the other hand, without the entry of an injunction, Wilbur-Ellis will lose the benefit of its goodwill, market position, and ultimately employees and customers. Such harm is substantial, and when compared to any harm Lacey might allege, weighs heavily in favor of injunctive relief.

### V.     THE PUBLIC INTEREST WEIGHS HEAVILY IN FAVOR OF GRANTING AN INJUNCTION AGAINST SIMPLOT.

No public interest weighs in favor of this Court refraining from issuing a preliminary injunction or temporary restraining order. The public has no interest in allowing breaches of or interference with restrictive covenants. *See N.I.S*, 724 F.2d at 710 (holding that if restrictive covenants are valid the public interest calls for their enforcement). In the instant case, there is simply no identifiable public interest that is paramount to Wilbur-Ellis's interests in having its valid contracts upheld and its customers and employees not stolen by a former employee and direct competitor. Accordingly, all of the *Dataphase* factors weigh in favor of enjoining: (a) Lacey from working for Wilbur-Ellis's direct competitor within the Restricted Territory; (b) Lacey from soliciting Wilbur-Ellis's employees; (c) Lacey from soliciting Wilbur-Ellis's customers within the Restricted Territory; (d) Lacey from tortiously interfering with Erikson's employment agreement with Wilbur-Ellis; and, (e) Simplot from tortiously interfering with Lacey's Employment Agreement.

### CONCLUSION

Based on the foregoing, Wilbur-Ellis respectfully requests that the Court grant the instant Motion for a Preliminary Injunction. Request for Oral Argument is hereby made by Plaintiff Wilbur-Ellis Company LLC pursuant to D.S.D. Civ. LR 7.1(C).

Dated:  June 20, 2023

/S/ David J. Goldstein
David J. Goldstein (Bar No. 4281)
dgoldstein@littler.com
Jeremy D. Sosna (*PHV to be submitted*)
jsosna@littler.com
Michelle A. Christ (*PHV to be submitted)*
mchristy@littler.com
LITTLER MENDELSON, P.C.
1300 IDS Center
80 South 8th Street
Minneapolis, MN 55402.2136
Telephone:      612.630.1000

**ATTORNEYS FOR PLAINTIFF**
**WILBUR-ELLIS COMPANY LLC**